**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: Shell Eggs Antitrust Litigation | MDL No. 3175 |

**REPLY IN SUPPORT OF MOTION FOR TRANSFER AND COORDINATION OR
<u>CONSOLIDATION UNDER 28 U.S.C. § 1407</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 2

    I.    THE SOUTHERN DISTRICT OF INDIANA IS THE MOST APPROPRIATE
        CHOICE FOR THE TRANSFEREE COURT .................................................................. 3

      A.    THE SOUTHERN DISTRICT OF INDIANA IS THE MOST CONVENIENT
           LOCATION FOR THE PARTIES AND FOR THE COLLECTION OF
           RELEVANT EVIDENCE ................................................................................. 4

      B.    THE GREATEST NUMBER OF PARTIES PREFERS TRANSFER TO
           THE SOUTHERN DISTRICT OF INDIANA ............................................................. 10

      C.    THE SOUTHERN DISTRICT OF INDIANA HAS FAVORABLE DOCKET
           CONDITIONS ..............................................................................................11

   II.    JUDGE TANYA WALTON PRATT WOULD EFFICIENTLY AND PRUDENTLY
       MANAGE THE PRETRIAL LITIGATION .................................................................. 13

CONCLUSION ..................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re Air Crash Disaster Near Santa Cruz Airport, Bombay, India on Jan. 1, 1978,*
    463 F. Supp. 158 (J.P.M.L. 1979) ................................................................. 7

*Am. Home Healthcare Servs., Inc. v. Floyd Mem'l Hosp. & Health Servs.,*
    No. 17 Civ. 00089, 2018 WL 1172995 (S.D. Ind. Mar. 5, 2018).............................. 14

*In re AT&T Inc. Cellular Customer Data Sec. Breach Litig.,*
    753 F. Supp. 3d 1368 (J.P.M.L. 2024) ...................................................................11

*Bushansky v. Remy Int'l, Inc.,*
    262 F. Supp. 3d 742 (S.D. Ind. 2017) ................................................................. 14

*In re Cobra Tax Shelters Litig.,*
    408 F. Supp. 2d 1348 (J.P.M.L. 2005) ...................................................................11

*In re Concrete & Cement Additives Antitrust Litig.,*
    730 F. Supp. 3d 1381 (J.P.M.L. 2024) ............................................................. 3, 4

*In re Doral Fin. Corp. Sec. Litig.,*
    398 F. Supp. 2d 1369 (J.P.M.L. 2005) ............................................................. 10

*In re Erie COVID-19 Bus. Interruption Protection Ins. Litig.,*
    509 F. Supp. 3d 1370 (J.P.M.L. 2020) ...................................................................11

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.,*
    No. 11 Civ. 8808, 2023 WL 5647204 (N.D. Ill. Aug. 31, 2023)........................ 15, 16

*In re MultiPlan Health Ins. Provider Litig.,*
    743 F. Supp. 3d 1376 (J.P.M.L. 2024) ............................................................. 10

*In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.,*
    201 F. Supp. 3d 1375 (J.P.M.L. 2016) ............................................................... 5

*In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.,*
    709 F. Supp. 3d 1380 (J.P.M.L. 2023) ............................................................... 5

*Partlow v. Asher,*
    No. 22 Civ. 01467, 2024 WL 3400228 (S.D. Ind. July 10, 2024) ......................... 14

*In re Pipe Flashing Pat. Litig.,*
    713 F. Supp. 3d 1414 (J.P.M.L. 2024) ............................................................... 4

*In re Processed Egg Prods. Antitrust Litig.*,
   392 F. Supp. 3d 498 (E.D. Pa. 2019) ................................................................ 15

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
   669 F. Supp. 3d 1372 (J.P.M.L. 2023) ......................................................... 14, 15

*Rock v. Nat'l Collegiate Athletic Ass'n*,
   No. 12 Civ. 01019, 2016 WL 1270087 (S.D. Ind. Mar. 31, 2016)........................ 14

*In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   278 F. Supp. 3d 1376 (J.P.M.L. 2017) ................................................................ 5

*In re Shale Oil Antitrust Litig.*,
   743 F. Supp. 3d 1371 (J.P.M.L. 2024) .......................................................... 6, 14

*Stoll v. Kraft Foods Glob., Inc.*,
   No. 09 Civ. 0364, 2010 WL 3613828 (S.D. Ind. Sept. 6, 2010)............................ 14

*Tyler Techs., Inc. v. Lexur Enters. Inc.*,
   No. 20 Civ. 00173, 2021 WL 2661751 (S.D. Ind. June 29, 2021)........................... 14

Pursuant to 28 U.S.C. § 1407 and Panel Rule 6.1(d), Plaintiff King Kullen Grocery Co., Inc.[1] ("Movant") respectfully submits this reply in support of its Motion for Transfer and Coordination or Consolidation ("Mot.") (Dkt. No. 1).[2] Movant respectfully requests that the cases listed in the attached Schedule of Actions ("Related Actions"[3]), along with any subsequently filed tag-along actions, be transferred to the United States District Court for the Southern District of Indiana for centralized pretrial proceedings.

## INTRODUCTION

Movant filed the first antitrust action nationwide alleging that Defendants, which include many of the nation's largest egg producers, conspired to artificially inflate the benchmark quote for eggs under the pretextual guise of avian flu outbreaks. King Kullen Compl.[4] ¶¶ 10-11. This quote, set by Defendant Urner Barry Publications, Inc. ("Urner Barry"), relies in part on the assessments of the egg producers' market reports. *Id.* ¶¶ 4-5. Movant, along with the other

---

[1] *King Kullen Grocery Co., Inc. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02274-TWP-MJD (S.D. Ind.).

[2] There are four filed oppositions to the Motion and one response in support of the Motion. *See* Dkt. Nos. 35, 36, 38, 39, 40. *See also* Rule 6.1(d) (allowing a 20-page limit for replies in response to more than one opposition).

[3] For purposes of this Reply, Movant defines all ten actions filed to this point, including its own, as the Related Actions. The Related Actions are, in order, starting from the first to file: *King Kullen Grocery Co., Inc. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02274-TWP-MJD (S.D. Ind.); *Nineteenseventynine, LLC v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02301-RLY-MJD (S.D. Ind.); *Edlin v. Cal-Maine Foods, Inc., et al.*, No. 3:25-cv-00946-JDP (W.D. Wis.); *Birchmans Parisian, LLC v. Cal-Maine Foods, Inc., et al.*, 1:25-cv-14030 (N.D. Ill.); *Phil-N-Cindy's Lunch, Inc. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-14082 (N.D. Ill.); *Habash et al. v. Urner Barry Publications, et al.*, No. 1:25-cv-14112 (N.D. Ill.); *Price, et al, v. Cal-Maine Foods, Inc., et al.*, No. 3:25-cv-01016-JDP (W.D. Wis.); *Yell-O-Glow Corp. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-15084 (N.D. Ill.); *Taylor Egg Prods., Inc. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02554-MPB-MJD (S.D. Ind.); *Hudson, et al. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02573-RLY-TAB (S.D. Ind.). The final four complaints have been filed since Movant filed its Motion to Transfer (Dkt. No. 1).

[4] *King Kullen Grocery Co., Inc. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02274-TWP-MJD (S.D. Ind.), Dkt. 1.

Plaintiffs in the Related Actions, allege that Defendants artificially inflated these quotes and then lowered them when accused of anticompetitive conduct. *Id.* ¶¶ 136, 144.

## ARGUMENT

Ten Related Actions, including Movant's, have been filed alleging that Defendants engaged in a conspiracy to artificially inflate the Urner Barry quote for egg prices. *See* Schedule of Actions. No party disputes that centralization is appropriate; the parties responding to Movant's initial motion disagree only as to the appropriate transferee district. *See* Dkt. No. 35 at 1; Dkt. No. 36 at 1; Dkt. No. 38 at 3; Dkt. No. 39 at 1; Dkt. No. 40 at 2. The number of parties in support of transfer to the various district courts at issue is as follows:

- **Indiana:** Twelve parties—Direct Purchasers King Kullen Grocery Co., Inc., Taylor Egg Products, Inc., and Consumer Indirect Purchasers Mary Hudson and Amy Sparrow,[5] and eight of nine Defendants[6]—support transfer to and consolidation of the proceedings in the Southern District of Indiana. Dkt. No. 1; Dkt. No. 36 at 1.

- **Wisconsin**: Nine parties—Consumer Indirect Purchaser Plaintiffs Matthew Edlin, India Price, Lakia Session, Karen Solomon, Tariq Habash, Delia Govea, Andrew Phillips, and

---

[5] Taylor Egg Products, Inc., filed its complaint (*Taylor Egg Prods. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02554-MPB-MJD (S.D. Ind.)) on December 17, 2025—after the December 15, 2025 deadline to respond to the instant Motion—but it has indicated that it supports transfer to Indiana. Mary Hudson and Amy Sparrow also filed their complaint (*Hudson, et al. v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02573-RLY-TAB (S.D. Ind.)) after the deadline for responding to this Motion (on December 19, 2025), but they too have represented that they support pretrial centralization and consolidation in the Southern District of Indiana.

[6] Defendants—Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Versova Holdings, LLC, Hillandale Farms (comprised of Hillandale Farms of PA, Inc.; Hillandale-Gettysburg, LLC; Hillandale Farms East, Inc.; Hillandale Farms, Inc., and Hillandale Farms Corporation), Urner Barry Publications, Inc. (d/b/a Expana), Egg Clearinghouse, Inc., United Egg Producers, and Daybreak Foods, Inc.—support consolidation and transfer to the Southern District of Indiana. Opal Foods, Inc. did not respond. When referring to Defendants in this Reply, Movant refers only to the eight of nine Defendants who responded to the Motion.

Catalina Torres,[7] and Commercial Indirect Purchaser Nineteenseventynine LLC[8]—support transfer to and consolidation of the proceedings in Western District of Wisconsin. Dkt. No. 35 at 1, 3 at n.5; Dkt. No. 39 at 1.

- **Illinois:** Three parties—Direct Purchaser Plaintiffs Yell-O-Glow Corporation, Birchmans Parisian, LLC, and Phil-N-Cindy's Lunch, Inc.—support transfer to and consolidation of the proceedings in the Northern District of Illinois. Dkt. No. 38 at 3; Dkt. No. 40 at 2.[9]

For the reasons stated below, the Southern District of Indiana is the forum in which this litigation should be consolidated for pretrial proceedings.

## I.    THE SOUTHERN DISTRICT OF INDIANA IS THE MOST APPROPRIATE CHOICE FOR THE TRANSFEREE COURT

In determining the appropriate transferee district, the Panel considers a variety of factors, including, though not limited to: (1) whether the District is a "convenient and accessible venue for [] nationwide litigation" and "geographically central" for involved parties; (2) the location of "[r]elevant documents and witnesses"; (3) the parties' preferences; and (4) the experience of the transferee judge and whether the judge has not yet been afforded the opportunity to handle multidistrict litigation. *See, e.g.*, *In re Concrete & Cement Additives Antitrust Litig.*, 730 F. Supp. 3d 1381, 1382 (J.P.M.L. 2024). Each of these factors supports transfer to the Southern District of Indiana.

---

[7] Movant notes that, of these eight consumer indirect purchasers, Price, Session, and Solomon filed a singular complaint (*see Price, et al, v. Cal-Maine Foods, Inc., et al.*, No. 3:25-cv-01016-JDP (W.D. Wis.), Dkt. No. 1 ¶ 1); Habash, Govea, Philips, and Torres filed a singular complaint (*see Habash et al. v. Urner Barry Publications, et al.*, No. 1:25-cv-14112 (N.D. Ill.), Dkt No. 1 ¶¶ 18-29); and Edlin filed alone (*see Edlin v. Cal-Maine Foods, Inc., et al.*, No. 3:25-cv-00946-JDP (W.D. Wis.), Dkt. No. 1 ¶ 18).

[8] Plaintiff Nineteenseventynine, LLC filed its complaint in the Southern District of Indiana. *See Nineteenseventynine, LLC v. Cal-Maine Foods, Inc., et al.*, No. 1:25-cv-02301-RLY-MJD (S.D. Ind.).

[9] In the alternative, the Illinois Movants suggest that transfer to the Western District of Wisconsin is appropriate. Dkt. No. 38 at 19; Dkt. No. 40 at 13-14.

### A. THE SOUTHERN DISTRICT OF INDIANA IS THE MOST CONVENIENT LOCATION FOR THE PARTIES AND FOR THE COLLECTION OF RELEVANT EVIDENCE

**Geographic proximity.** The Southern District of Indiana "presents a convenient and accessible venue for [] nationwide litigation, and [] is geographically central to the involved . . . parties." *Id.* The Indiana forum provides clear geographic advantages to the parties.

While Illinois Movants argue that Chicago "sits as the best geographic center of [the defendants'] locations," Dkt. No. 38 at 11, this is not true. First, Indiana is home to defendant Rose Acre Farms, Inc., and Illinois is not home to any Defendant. And, of the nine Defendants, **seven** are located closer to the Southern District of Indiana than to either of the other two competing district courts. Indeed, as shown in Appendix A, transfer to this district would, on average, minimize the distance as the crow flies between the courthouse and Defendants' principal places of business when compared to the distance between the courthouses in the other districts and the Defendants' principal places of business. *See* Appendix A. In addition, given the nationwide geographic dispersion of the plaintiffs (who are spread across the country in New York, California, Washington, D.C., Arizona, South Carolina, Illinois, Massachusetts, New Hampshire, and Florida,[10] with the largest concentration tied between New York and California), as well as the concentration of defendants in the Midwest, Indiana's central location is the logical choice, especially considering the preferences of the parties (*see infra*). *See In re Pipe Flashing Pat. Litig.*, 713 F. Supp. 3d 1414, 1415–16 (J.P.M.L. 2024) (transferring to district that "provides a convenient

---

[10] *See* King Kullen Compl. ¶ 20 (New York); Nineteenseventynine LLC Compl. ¶ 19 (Arizona); Edlin Compl. ¶ 18 (California); Birchmans Parisian, LLC Compl. ¶ 23 (New York); Phil-N-Cindy's Lunch, Inc. Compl. ¶ 23 (New York); Habash Compl. ¶¶ 18, 21, 24, 27 (Washington, D.C., California, New York, and Florida); Price Compl. ¶¶ 18-20 (California, South Carolina, and Illinois); Yell-O-Glow Corp. Compl. ¶ 36 (Massachusetts); Taylor Egg Prods., Inc. Compl. ¶ 20 (New Hampshire); Hudson Compl. ¶¶ 18-19 (California and Arizona).

and accessible location for the geographically dispersed actions and parties" and where "defendants in all actions support centralization"); *In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 278 F. Supp. 3d 1376, 1378 (J.P.M.L. 2017) (transferring to Western District of Oklahoma, which was "centrally located relative to the geographically dispersed domestic defendants"); *In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.*, 201 F. Supp. 3d 1375, 1379 (J.P.M.L. 2016) (where plaintiffs were "geographically dispersed," transferring to district that was "centrally located relative to defendant" and that "Defendant [] and plaintiffs in ten actions support[ed]").

**Relevant evidence and witnesses.** In addition, as Indiana is closest to the majority of Defendants' headquarters, the relevant evidence and witnesses are likely to be in or closer to Indiana than the other proposed venues, making Indiana the prudent choice of forum. *See In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 709 F. Supp. 3d 1380, 1383 (J.P.M.L. 2023) (transferring to Eastern District of New York when "common witnesses and other relevant evidence likely will be found in or near this district given the location of several defendants' headquarters in the New Jersey and New York area"). Indeed, as Defendants note in their responsive papers, Cal-Maine Foods, Inc. (though headquartered in Mississippi) employs more than 100 people who live and work in Indiana. Dkt. No. 36 at 3. Further, Defendants highlight that all but one of the named Plaintiffs in the actions filed in Illinois do not plead any relationship to Illinois, either through their residence or through an egg purchase in Illinois. *Id.* at 4.

The fact that the Chicago Office of the Department of Justice's ("DOJ") Antitrust Division may be investigating price-fixing in the shell egg industry does not (contrary to what Illinois Movants suggest, *see* Dkt. No. 40 at 8) favor consolidation in the Northern District of Illinois. The Chicago Office of DOJ's Antitrust Division works generally within the Midwest geographic area

and, like the other field offices of the Antitrust Division, files cases in many different federal districts. Accordingly, Indiana (and thus Indiana federal courts), is explicitly placed within its territory.[11] Moreover, the Antitrust Division has not filed any charges or claims in the matter to date, meaning that there is no government litigation with which to coordinate, even if that were desirable. To the extent the Antitrust Division maintains its investigation and has any reason to interact with the litigants or the court in this consolidated matter, such as by filing a statement of interest, it is fully capable of doing so in the Southern District of Indiana.

Wisconsin Movants argue that, because Defendant Daybreak Foods is headquartered in the Western District of Wisconsin, relevant witnesses and documents will be there, too. Dkt. 35 at 4. But Defendants, who are most likely to know the locations of relevant witnesses and documents, collectively prefer the Southern District of Indiana and state that it is "significantly less likely that a meaningful amount of relevant evidence or meaningful number of key witnesses will be found in either Illinois or Wisconsin." Dkt. No. 36 at 4.

**Factual nexus.** Indiana also bears a certain factual nexus to the litigation that neither Wisconsin nor Illinois has. It is one of the top five egg-producing states in the country, along with Iowa, Pennsylvania, Ohio, and Texas. King Kullen Compl. ¶¶ 27-31, 75. Further, Indiana is home to Rose Acre, a major player in the litigation as the second largest egg producer in the United States. *Id.* ¶ 28. Indiana's connection to the egg-production industry thus makes it an ideal place to which to transfer the MDL. *See In re Shale Oil Antitrust Litig.*, 743 F. Supp. 3d 1371, 1372 (J.P.M.L. 2024) (transferring to the District of New Mexico, which "bears a factual nexus to the

---

[11] *See* U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION MANUAL, 5TH ED., at page I-8 (Jan. 19, 2021), https://web.archive.org/web/20220121012943/https://www.justice.gov/atr/file/761126/download. Note that the 5th edition is the most recent, public version. It is currently being revised, *see* https://www.justice.gov/atr/division-manual.

litigation, given that plaintiffs contend that much of defendants' shale oil production occurs in New Mexico"); *In re Air Crash Disaster Near Santa Cruz Airport, Bombay, India on Jan. 1, 1978*, 463 F. Supp. 158, 159 (J.P.M.L. 1979) (transferring to Western District of Washington because defendant "Boeing is headquartered in that district, and the aircraft involved in this crash was manufactured there," so "documents and personnel relating to the design, manufacture and testing of the aircraft are located there").

The Illinois Movants point to conferences that took place in Chicago in 2022 and 2024 in an effort to suggest that the Illinois forum is the "crossroads of the egg business and would be a convenient district." Dkt. No. 40 at 10. This argument overstates the importance of these summits—two conferences taking place over a handful of days within the past three years hardly make the Illinois forum the "crossroads" of the industry.

The Wisconsin Movants argue that, because several Defendants are present in or near their district, centralization is proper there. Dkt. No. 35 at 4. But, as stated above, the Southern District of Indiana is closer to the majority of Defendants' headquarters.

**Convenience and accessibility.** Finally, centralizing the litigation in Indianapolis rather than in Illinois or Wisconsin better serves "the convenience of parties and witnesses." 28 U.S.C. § 1407.

With respect to travel, Indianapolis provides the accessibility of a metropolitan area without the same congestion and expense found in Chicago. Three hundred four (304) flights have traveled through Indianapolis International Airport every day on average over the past month,[12] and there are nonstop flights to and from many of the locations where the parties and counsel are

---

[12] *Indianapolis International Airport IND Flight Statistics*, Airportia (last visited Dec. 21, 2025), https://www.airportia.com/united-states/indianapolis-international-airport/statistic/. Note that this statistic is an average of flights over the past month and therefore will change over time.

located, such as the New York/New Jersey area, California, Washington, D.C. area (including Baltimore), Minneapolis, Boston, Philadelphia, Atlanta, and Chicago.[13] While Chicago O'Hare and Midway have more flights available, traveling to Chicago is taxing, with Chicago O'Hare recently ranked as the world's fifth most stressful airport.[14] Further, in the J.D. Power North America Airport Satisfaction Study, both of Chicago's airports—Midway and O'Hare—fell below average in their categories; meanwhile, the Indianapolis International Airport has ranked the highest among medium sized airports for four years in a row.[15] Indianapolis International Airport is also less than 15 miles away from the federal courthouse (less than 20 minutes with no traffic).[16] While Chicago's airports are also comparably close to the courthouse (in mileage terms), the city also has the worst traffic in the United States, outranking both New York City and Los Angeles, a fact that is more likely to make the drive from the airport to the courthouse far longer and more burdensome.[17] Thus, contrary to what the Illinois Movants maintain, Chicago is not more readily and easily accessible.

---

[13] Indianapolis International Airport, Nonstop Destinations (last accessed Dec. 21, 2025), https://www.ind.com/flights.

[14] *Which airports are the world's most stressful?*, iSelect (Oct. 2025), https://www.iselect.com.au/travel-insurance/insights/most-stressful-airports/ (study from travel insurance comparison service iSelect conducting study based on "flight delays, ease of getting to the airport, flight cancellations, check-in and security wait time, among other key factors").

[15] Press Release, North American Airports See Gains in Passenger Satisfaction Thanks to Capital Improvements and Efforts to Localize Terminal Experience, J.D. Power Finds, J.D. Power (Sept. 17, 2025), https://www.jdpower.com/business/press-releases/2025-north-america-airport-satisfaction-study.

[16] Driving Directions from Indianapolis International Airport to US District Court - Southern Indiana, 46 E Ohio St, Indianapolis, IN 46204, Google Maps (last visited Dec. 21, 2025), https://tinyurl.com/mwajtcxe.

[17] Josh Marcus, The US city with the worst traffic revealed and it's not LA or NYC, THE INDEPENDENT (Dec. 6, 2025), https://www.independent.co.uk/news/world/americas/chicago-us-city-worst-traffic-b2879233.html

Indianapolis also proves to be more readily and easily accessible than Madison, Wisconsin. The airport closest to the Western District of Wisconsin, Dane County Regional Airport, averages only eighty-six (86) flights per day over the past month with a much more limited offering of nonstop destinations.[18] Direct flights to Indianapolis, Baltimore, Austin, and New York's JFK Airport, for example, are not available.[19] Thus, locating the MDL near a regional airport would significantly burden the parties' ability to travel there. At the same time, Milwaukee Mitchell International Airport, which Wisconsin Movants call "close by," Dkt. No. 39 at 4, is more than 80 miles away from the Western District of Wisconsin courthouse by car,[20] making that drive five times longer (by mileage) than the drive from airport to courthouse in Indiana.

Finally, centering the litigation in Indianapolis, a more affordable city, would conserve the resources of the parties. *See* Dkt. No. 36 at 4-5 (citing per diem rates for federal employees for the proposition that "the cost of traveling to and proceeding through litigation in Indianapolis during that time will be approximately 24 percent lower than doing so in Chicago"). Indianapolis has many affordable, high-quality hotels within walking distance of the courthouse.[21] Indianapolis

---

[18] Madison Dane County Regional Airport Flight Statistics, Airportia (last visited Dec. 21, 2025), https://www.airportia.com/united-states/dane-county-regional-truax-field-airport/statistic/#google_vignette. Note that this statistic is an average of flights over the past month and therefore will change over time.

[19] Madison Dane County Regional Airport MSN Flight Statistics, Airportia (last visited Dec. 21, 2025), https://www.airportia.com/united-states/dane-county-regional-truax-field-airport/statistic/#google_vignette; Where We Fly, Dane County Regional Airport (last visited Dec. 21, 2025), https://www.msnairport.com/flight_travel/where.

[20] Driving Directions from Milwaukee Mitchell International Airport to U.S. Federal Court, 120 N Henry St #320, Madison, WI 53703, Google Maps (last visited Dec. 21, 2025), https://maps.app.goo.gl/cL45xoVz7yQ2TgoE6.

[21] *See, e.g.*, Columbia Club (https://www.columbia-club.org/); Aloft Indianapolis Downton (https://www.marriott.com/en-us/hotels/indal-aloft-indianapolis-downtown/overview/); Sheraton Indianapolis City Centre Hotel (https://www.marriott.com/en-us/hotels/indsc-sheraton-indianapolis-city-centre-hotel/overview/?scid=f2ae0541-1279-4f24-b197-a979c79310b0&msockid=2f2f337e826c6c6d23a825f883186d16); Hilton Garden Inn

provides, on average, less expensive hotel prices per night than Chicago and Madison.[22] Indianapolis also has more affordable taxi fares, making airport travel less expensive.[23] Overall, centering the litigation in Indianapolis would allow the parties to reap the benefits of a metropolitan area while still remaining easy and cost-efficient for the parties.

## B. THE GREATEST NUMBER OF PARTIES PREFERS TRANSFER TO THE SOUTHERN DISTRICT OF INDIANA

The Panel has often transferred Related Actions to the district that the greatest number of parties prefers. *See In re MultiPlan Health Ins. Provider Litig.*, 743 F. Supp. 3d 1376, 1377 (J.P.M.L. 2024) (transferring to a district that "has the support of both some plaintiffs and all defendants"); *In re Doral Fin. Corp. Sec. Litig.*, 398 F. Supp. 2d 1369, 1370 (J.P.M.L. 2005) (transferring to the district favored by "most of the responding parties, including the defendants"). As stated above, the greatest number of parties (eight Defendants and four Plaintiffs) prefers transfer to the Southern District of Indiana. Three Plaintiffs prefer the Northern District of Illinois, and nine Plaintiffs prefer the Western District of Wisconsin.[24] The Southern District of Indiana has the most support.

---

Indianapolis    Downtown    (https://www.hilton.com/en/hotels/inddhgi-hilton-garden-inn-indianapolis-downtown/).

[22] Budget Your Trip, Madison Average Hotel Costs (last visited Dec. 21, 2025), https://www.budgetyourtrip.com/hotels/united-states-of-america/madison-5261457 (average hotel price per night $155-289); *Id.*, Chicago Average Hotel Costs, https://www.budgetyourtrip.com/hotels/united-states-of-america/chicago-4887398 (average hotel price per night $160-299); *id.*, Indianapolis Average Hotel Costs https://www.budgetyourtrip.com/hotels/united-states-of-america/indianapolis-4259418 (average hotel price per night $122-227).

[23] Taxi Calculator (last accessed Dec. 21, 2025), Madison, https://www.taxi-calculator.com/taxi-fare-madison-wi/1105 (Madison has base fee $4.00 and price per mile $3.22); Chicago, https://www.taxi-calculator.com/taxi-fare-chicago/261 (Chicago has base fee $3.25 and price per mile $2.25); Indianapolis, https://www.taxi-calculator.com/taxi-fare-indianapolis/270 (Indianapolis has base fee $2.00 and price per mile $2.75).

[24] Notably, however, eight of these Plaintiffs represent only three separate Actions. *See supra* n.7.

10

Moreover, while there are an equal number of cases pending in the Southern District of Indiana and the Northern District of Illinois, the first-filed case is pending in the Southern District of Indiana, a fact which weighs in favor of transfer to that district and which Defendants also highlight.[25] Dkt. No. 36 at 2. *See also In re Cobra Tax Shelters Litig.*, 408 F. Supp. 2d 1348, 1349 (J.P.M.L. 2005) (transferring to the Southern District of Indiana, even though more actions were pending elsewhere, in part because "Southern District of Indiana has 1) the first-filed action; 2) the support of the common defendant to this litigation; and 3) the resources that this complex tax matter is likely to require").

### C. THE SOUTHERN DISTRICT OF INDIANA HAS FAVORABLE DOCKET CONDITIONS

The Panel has frequently chosen to transfer to underutilized districts because they have more resources to manage a large case. *See In re AT&T Inc. Cellular Customer Data Sec. Breach Litig.*, 753 F. Supp. 3d 1368, 1372–73 (J.P.M.L. 2024) ("This litigation offers an opportunity to assign an MDL to an underutilized district that has the capacity to manage the MDL efficiently"); *In re Erie COVID-19 Bus. Interruption Protection Ins. Litig.*, 509 F. Supp. 3d 1370, 1374 (J.P.M.L. 2020) (transferring to "an accessible forum with the capacity to efficiently manage these cases"). The Southern District of Indiana fits these criteria, as it possesses more favorable docket conditions, and these docket conditions will allow the most expeditious and efficient management of the litigation.

Indeed, as of December 2, 2025, the Southern District of Indiana has just one pending MDL (before Judge Young) while the Northern District of Illinois currently presides over twelve

---

[25] The second-filed case is also in the Southern District of Indiana, but the plaintiff in that case prefers transfer to the Western District of Wisconsin. *See supra.*

MDLs.[26] Moreover, during the twelve-month period from June 30, 2024 to June 30, 2025, the Northern District of Illinois had more than twice as many pending civil cases[27] and more than four times as many civil cases filed as the Southern District of Indiana.[28] While many of the Illinois forum's cases may result from its twelve other MDLs, the number of civil cases overall still presents logistical and administrative demands on the court system not currently present in the Southern District of Indiana. In addition, the Southern District of Indiana was the only court in the Seventh Circuit to see a decrease in pending civil cases from the twelve-month period ending June 30, 2024 to the twelve-month period ending June 30, 2025.[29] Further, during the twelve-month period ending March 31, 2025, the Southern District of Indiana also brought civil cases from filing to trial in, on average, 32.9 months—in contrast to the Northern District of Illinois, which did the same on average in 58.6 months.[30]

While the Wisconsin forum has no pending MDLs—a fact noted by the Wisconsin Movants to support their argument that docket conditions are more favorable in their proposed venue, Dkt.

---

[26] UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION, MDL Statistics Report - Distribution of Pending MDL Dockets by District, United States Judicial Panel on Multidistrict Litigation (Dec. 2, 2025), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-December-2-2025.pdf.

[27] UNITED STATES COURTS, Table C. U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending June 30, 2024 and 2025, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.uscourts.gov%2Fsites%2Fdefault%2Ffiles%2Fdocument%2Fstfj_c_630.2025.xlsx&wdOrigin=BROWSELINK.

[28] *Id.*

[29] *Id.*

[30] UNITED STATES DISTRICT COURTS — National Judicial Caseload Profile (12 month period ending March 31, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile0331.2025.pdf.

No. 35 at 5-6—it is also true that the Western District of Wisconsin has only two judges,[31] as opposed to the five in the Southern District of Indiana.[32] This makes judicial conflicts and recusals, resulting in yet another transfer to a different district rather than a simple transfer to another judge, a greater possibility than in Indiana. Second, as stated above, from the twelve-month period ending June 30, 2024 to the twelve-month period ending June 30, 2025, pending civil cases in the Western District of Wisconsin increased 16.1%, while they decreased in the Southern District of Indiana by 2.4%.[33] These favorable docket conditions indicate that Southern District of Indiana would be an efficient transferee district for an MDL.

## II.    JUDGE TANYA WALTON PRATT WOULD EFFICIENTLY AND PRUDENTLY MANAGE THE PRETRIAL LITIGATION

Finally, Movant notes that Judge Tanya Walton Pratt, who served as Chief Judge of the Southern District of Indiana from 2021 to 2025[34] and is the judge to whom Movant's case has been assigned, is an experienced jurist who is well-positioned to handle the litigation prudently and expeditiously.

Prior to being appointed to the federal bench, Judge Pratt amassed significant litigation and trial experience as well as judicial experience, working as a part-time public defender (where she tried more than 50 cases), an attorney at an Indianapolis civil rights law firm, and a state court judge.[35] Judge Pratt was then appointed to the federal bench in 2010, becoming the first African

---

[31] Judges, U.S. District Court for the Western District of Wisconsin (last visited Dec. 21, 2025), https://www.wiwd.uscourts.gov/judges.

[32] *See* National Judicial Caseload Profile, *supra* n.30.

[33] *See* Table C, *supra* n.27.

[34] U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, Judge Tanya Walton Pratt (last visited Dec. 21, 2025), https://www.insd.uscourts.gov/content/judge-tanya-walton-pratt.

[35] Daniel Carson, *Chief Judge Pratt, Indiana Lawyer's Lifetime Achievement Award winner, cites her father as first great mentor*, THE INDIANA LAWYER (May 30, 2024),

American federal judge in Indiana.[36] When she became Chief Judge of the court in 2021, she became the first person of color to serve as the Chief Judge in the Southern District of Indiana.[37]

Since being appointed to the federal bench, Judge Pratt has handled antitrust and class action litigations, and her considerable experience with these types of cases would serve her well in managing this case. *See, e.g.*, *Tyler Techs., Inc. v. Lexur Enters. Inc.*, No. 20 Civ. 00173, 2021 WL 2661751, at *1 (S.D. Ind. June 29, 2021) (antitrust); *Am. Home Healthcare Servs., Inc. v. Floyd Mem'l Hosp. & Health Servs.*, No. 17 Civ. 00089, 2018 WL 1172995, at *4 (S.D. Ind. Mar. 5, 2018) (antitrust); *Rock v. Nat'l Collegiate Athletic Ass'n*, No. 12 Civ. 01019, 2016 WL 1270087, at *1 (S.D. Ind. Mar. 31, 2016) (antitrust class action); *see also Partlow v. Asher*, No. 22 Civ. 01467, 2024 WL 3400228, at *1 (S.D. Ind. July 10, 2024) (class action); *Bushansky v. Remy Int'l, Inc.*, 262 F. Supp. 3d 742, 754 (S.D. Ind. 2017) (class action); *Stoll v. Kraft Foods Glob., Inc.*, No. 09 Civ. 0364, 2010 WL 3613828, at *1 (S.D. Ind. Sept. 6, 2010) (class action).

The Panel rarely assigns the same judge multiple MDLs, and the Panel often chooses to assign an MDL to judges who have not yet had the opportunity to handle one. *See In re Shale Oil Antitrust Litig.*, 743 F. Supp. 3d at 1372 ("Judge Matthew L. Garcia has not yet had an opportunity to oversee a multidistrict litigation docket, and we are confident he will steer this litigation on a prudent and expeditious course."); *In re RealPage, Inc., Rental Software Antitrust Litig.*, 669 F. Supp. 3d 1372, 1373 (J.P.M.L. 2023) ("Further, centralization in this district permits the Panel to assign this litigation to a less-utilized transferee forum with an experienced judge who has not yet

---

https://www.theindianalawyer.com/articles/chief-judge-pratt-indiana-lawyers-lifetime-achievement-award-winner-cites-her-father-as-first-great-mentor.

[36] Judge Tanya Walton Pratt, *supra* n.34.

[37] Press Release, *Southern District of Indiana Announces New Chief Judge*, U.S. District Court for the Southern District of Indiana (Mar. 22, 2021), https://www.insd.uscourts.gov/news/southern-district-indiana-announces-new-chief-judge.

14

overseen a multidistrict litigation"). Judge Pratt has not yet had the opportunity to oversee an MDL,[38] and she would make an exemplary choice to do so. Indeed, given her experience, capability, and familiarity with both antitrust law and class actions, consolidation of the Related Actions before her will ensure that this matter proceeds before a jurist who "will steer this litigation on a prudent and expeditious course." *In re RealPage, Inc., Rental Software Antitrust Litig.*, 669 F. Supp. 3d at 1373.

Illinois Movants suggest that transfer and consolidation in Illinois is warranted because of Judge Steven C. Seeger's connection to a prior antitrust litigation alleging price fixing among egg producers. Dkt. No. 38 at 16. Illinois Movants, however, overstate the relevance of that connection to these current proceedings.

First, the crux of that prior litigation, which began fourteen years ago and alleged a conspiracy lasting from 1999 to 2008, was that "egg producers adopted animal-welfare guidelines known as the UEP Certified Program to reduce the supply of eggs." *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11 Civ. 8808, 2023 WL 5647204, at *1 (N.D. Ill. Aug. 31, 2023). This is materially different conduct than is alleged in any of the actions that are the subject of the instant consolidation motion. Second, the *Kraft* plaintiffs were large, individual "purchasers of *egg products*, meaning 'eggs, either whole or separated, that have been removed from their shells and are then processed into dried, frozen, or liquid forms.'" *Id.* (emphasis in original) (quoting *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 502 (E.D. Pa. 2019)). All Plaintiffs here allege classwide damages arising from purchases of shell eggs[39], and the markets have

---

[38] All of the jurists in the Southern District of Indiana are eminently qualified, and each would be well-equipped to preside over these consolidated proceedings.

[39] "'[S]hell eggs', also known as 'table eggs[,]'. . . are eggs in the form most familiar to buyers: fresh, uncooked, and in an intact shell." King Kullen Compl. ¶ 189.

appreciable differences.[40] Accordingly, Judge Seeger's experience with that distinct matter would not necessarily generate meaningful efficiencies here because the trial over which he presided was premised on different factual allegations,[41] and it does not compel transfer to the Northern District of Illinois.[42]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Panel order that the Plaintiff's Action and the Related Actions, as well as all subsequent tag-along actions, be transferred to and centralized in the Southern District of Indiana for consolidated or coordinated pretrial proceedings.

Dated: December 22, 2025

Respectfully submitted,

/s/ *David E. Kovel*
David E. Kovel
Thomas W. Elrod
Lauren Wands

---

[40] For example, "[c]onventional shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods." *Id.* ¶ 191.

[41] Judge Seeger's role in the *Kraft* litigation was limited to the trial and post-trial briefing, rather than the pretrial MDL proceedings, which another judge handled. *See Kraft Foods Glob*, 2023 WL 5177501, at *1 (Seeger, J.) ("Judge Pratter [of the Eastern District of Pennsylvania] presided over the MDL proceedings, including discovery, expert disclosures, and dispositive motions. After resolving the last motion for summary judgment, Judge Pratter remanded the case to this district for trial.").

[42] In a similar argument, the Illinois Movants point out that, generally, judges in the Northern District of Illinois have previously handled complex MDLs regarding food and agricultural products. Dkt. 38 at 15-16. But this fact—without noting how or why such other "complex matters involving food and agricultural products" are at all similar or related to the proceedings herein— does not suggest any concrete efficiencies that might be generated by transfer and consolidation of these proceedings to the Northern District of Illinois.

James Isacks
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
lwands@kmllp.com
jisacks@kmllp.com

Robert J. Gralewski, Jr.
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
(858) 834-2044
bgralewski@kmllp.com

Gregory S. Asciolla
Alexander E. Barnett
Jonathan S. Crevier
Carrie A. Syme
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
jcrevier@dicellolevitt.com
csyme@dicellolevitt.com

Heidi M. Silton
Jessica N. Servais
Joseph C. Bourne
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

Irwin B. Levin
Scott D. Gilchrist
Edward B. Mulligan V
**COHENMALAD, LLP**
One Indiana Square, Suite 1400

17

Indianapolis, IN 46204
(317) 636-6481
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com
nmulligan@cohenmalad.com

***Attorneys for King Kullen Grocery Co., Inc.
and the Proposed Class***