**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: SHELL EGGS ANTITRUST LITIGATION | MDL No. 3175 |

**ILLINOIS DIRECT PURCHASER YELL-O-GLOW CORPORATION'S RESPONSE TO MOTION FOR TRANSFER AND COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407**

## Table of Contents

I.      FACTUAL BACKGROUND.................................................................................................. 3

II.     ARGUMENT..................................................................................................................... 5

    A.    Centralization Under 28 U.S.C. § 1407 Is Appropriate And Would Serve The Convenience Of The Parties And Witnesses And Would Promote The Just And Efficient Management Of The Related Actions. ...................................................................................................................5

        1.    The Related Actions all involve common factual questions and legal issues................................................. 6

    B.    The Panel Should Centralize the Related Actions In the Northern District of Illinois, Rather Than In the Southern District of Indiana .................................................................................................8

        1.    The Northern District of Illinois Is Decisively More Convenient and Accessible A Forum For this Litigation than Indiana.............................................................................................................................. 9

        2.    The Northern District of Illinois is likely to contain significant evidence and witnesses relevant to the Related Actions. ....................................................................................................... 12

        3.    The Northern District of Illinois is well-resourced and has extensive experience with complex litigation, especially litigation involving food and agricultural products............................................ 14

        4.    Judge Seeger has experience with related litigation that supports transfer to the Northern District of Illinois, as do many other judges in the district............................................................................ 15

        6.    If the Panel does not Transfer the Related Actions to the Northern District of Illinois, the Western District of Wisconsin is the Next Most Appropriate Forum........................................................................ 18

III.    CONCLUSION ...................................................................................................................19

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation (the "Panel"), Direct Purchaser Plaintiff Yell-O-Glow Corporation ("Illinois Direct Purchaser Plaintiff") respectfully supports consolidation and transfer to the Northern District of Illinois. This venue offers significant advantages for efficient pretrial proceedings and resource conservation for both the parties and the judiciary, given its superior transportation access and ample, affordable accommodations in close proximity to the courthouse. The Department of Justice office in the Northern District of Illinois is currently conducting active investigations into companion criminal prosecutions involving identical core facts and parties. Judge Steven C. Seeger stands out as an exceptionally qualified candidate for assignment, given his expressed willingness to oversee this litigation, comprehensive knowledge of the pertinent industry, familiarity with the claims and defendants, ongoing supervision of all related actions consolidated within the Northern District of Illinois, and significant judicial experience. Additionally, Judge Seeger is recognized for exemplary case management and previously presided over a jury trial involving the same parties and substantially similar claims during a different period. Judge Seeger currently manages a light caseload and has not been assigned to a multidistrict litigation (MDL) matter before.

## I.    FACTUAL BACKGROUND

Shell eggs play an important role in the American diet. During the specified class periods, billions of dollars in conventional eggs were produced, sold, and distributed nationwide, with products and payments crossing state lines. Eggs are considered an essential commodity in the marketplace. *See* Complaint, ECF No. 1 ("Complaint") ¶ 3. The prices at which egg producers sell eggs are dependent on benchmark prices set by Defendant Urner Barry Publications, Inc. ("Urner Barry") *Id.* ¶ 71-74. Urner Barry establishes the UB quotation by relying on market

assessments provided by the Defendant Egg Producers. *Id.* ¶¶ 73-74.

Each Related Action is based on the same additional core facts and issues of law. Beginning in January 2022, the Conventional Shell Egg Producer Defendants ("Egg Producer Defendants") participated in a conspiracy to artificially increase the UB quote, leading to higher egg prices and significant profits for the defendants. During the period of the alleged conspiracy, the Egg Producer Defendants persistently promoted the unsubstantiated claim that a brief avian flu outbreak justified the price increases. In March 2025, media outlets reported that the Department of Justice was investigating potential price-fixing among egg producers, including Cal-Maine and Rose Acre. Shortly thereafter, wholesale egg prices declined by approximately 63% within two weeks, evidencing that previous pricing resulted from coordinated actions and not legitimate market competition or the effects of avian influenza.

These additional facts relevant to the Panel's instant deliberations are also not in dispute Judge Seeger, an experienced jurist, presided over a jury trial in which opt-out direct purchasers brought claims against the same Defendants related to their unlawful control of the Conventional Shell Egg industry during a period of time that is unrelated to and predates the present actions.[1]

Judge Seeger possesses extensive knowledge of the industry and the Defendants. His courtroom is well-organized and operates efficiently. His current caseload is below the average for members of the judiciary in the Northern District of Illinois. Although appointed in 2017, he has not yet been assigned a multidistrict litigation (MDL) case. On December 22, 2025, all actions filed in the Northern District of Illinois related to the Conventional Shell Egg litigation were

---

[1]    In this trial, Cal-Maine and other defendant entities named in all related actions were found liable for price fixing, resulting in damages awarded to three opt-out plaintiffs; these damages were trebled to $53 million.

ordered referred to Judge Seeger. *See Birchmans Parisian, LLC v. Cal-Maine Foods, Inc.* Case No.: 25-cv-14030 at Dkt. 32.

The Northern District of Illinois Department of Justice's Antitrust Division Chicago Field Office is leading the federal investigation into the same conventional shell egg producers regarding the same price increases during the same period at issue in all Related Actions.

The Northern District of Illinois is well-resourced and centrally located, providing greater convenience and accessibility than Indiana, Wisconsin, and essentially any other U.S. forum. Chicago provides substantially greater direct-flight access and overall transportation convenience than the Southern District of Indiana or the Western District of Wisconsin.

## II.    ARGUMENT

### A. Centralization Under 28 U.S.C. § 1407 Is Appropriate And Would Serve The Convenience Of The Parties And Witnesses And Would Promote The Just And Efficient Management Of The Related Actions.

Every party in every Related Action supports prompt consolidation of the instant antitrust litigation, as the litigation is focused on a dispute involving hundreds of millions of dollars between the five (5) Defendant Conventional Egg Shell Producers and thousands of direct purchasers and hundreds of millions of indirect end-use purchasers. Consolidation will facilitate a more efficient resolution of the proceedings.

This important litigation involves countless parties across the entire United States holding essentially identical claims that revolve around the same core facts, discovery and contested legal issues. Consolidation will eliminate duplicitous discovery, inconsistent rulings and needless litigation costs. When civil actions "involv[e] one or more common questions of fact" and this Panel determines that centralization will further "the convenience of parties and witnesses and

will promote the just and efficient conduct of such actions" centralization in one judicial district

is appropriate.  28 U.S.C. § 1407(a). Transfer "eliminate[s] duplication in discovery, avoid[s]

conflicting rulings and schedules, reduce[s] litigation cost, and saves the time and effort of the

parties, the attorneys, the witnesses, and the courts." Manual for Complex Litigation § 20.131

(4th ed. 2004). Centralization of the Related Actions meets each of these objectives.

### 1.  The Related Actions all involve common factual questions and legal issues.

Common factual questions that support centralization exist where multiple actions "arise

from the same factual milieu" and are expected to involve a significant number of common

allegations, defendants, and witnesses. *In re ClassicStar Mare Lease Litig.*, 528 F. Supp. 2d 1345,

1346 (J.M.P.L. 2007); *see also In re: Gadolinium Contrast Dyes Prods. Liab. Litig.*, 536 F. Supp.

2d 1380, 1382 (J.P.M.L. 2008) ("Transfer under Section 1407 does not require a complete identity

or even a majority of common factual or legal issues as a prerequisite to transfer."). Here, common

issues of law and fact predominate in the Related Actions.

The common questions at issue here are many and include but are certainly not limited to:

the nature and scope of the conventional shell egg market, whether the defendants control the

conventional shell egg market; whether defendants entered into unlawful agreement(s); whether

the Defendants unlawfully manipulated the UP data; the actual impact the Avian Influenza had on

the conventional shell egg market;  the actual impact the Avian Influenza had on pricing in the

conventional shell egg market; whether defendants conspired to exploit the outbreak of Avian

Influenza in order to artificially raise the price for eggs; whether defendants' conduct violated

Section 1 of the Sherman Act or state antitrust laws; and whether defendants conduct resulted in

artificially inflated prices for eggs. These and other overlapping factual and legal issues support

consolidation under 28 U.S.C. § 1407, especially in the antitrust context where this Panel has often

favored centralization. *See, e.g.*, *In re Inclusive Access Course Materials Antitrust Litig.*, 482 F. Supp. 3d 1358, 1359 (J.P.M.L. 2020) ("[T]he Panel frequently centralizes litigation involving differently-situated plaintiffs and differently-defined putative classes, where, as here, all actions arise from a common factual core."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d 1361, 1362 (J.P.M.L. 2014) (centralizing litigation consisting of direct purchaser class actions, indirect purchaser class actions, and individual actions brought by competitors, where all actions "raise[d] virtually identical factual questions"); *see also In re Archery Prods. Antitrust Litig.*, No. MDL 3160, 2025 WL 2937322, at *1 (J.P.M.L. Oct. 16, 2025) (granting centralization where, "Plaintiffs in all actions assert virtually identical price-fixing claims under the Sherman Act."); *In re MultiPlan Health Ins. Provider Litig.*, 743 F. Supp. 3d 1376, 1377 (J.P.M.L. 2024) (finding centralization appropriate where "actions share factual questions arising from an alleged conspiracy to fix, suppress, and stabilize reimbursement rates paid to healthcare providers . . . in violation of the Sherman Act").

The plaintiffs in each Related Actions will pursue the same discovery from the same defendants and prove their case through similar if not identical testimony, documents, and transactional data. The Panel should centralize the Related Actions to promote efficient litigation and prevent conflicting rulings on the same legal and factual issues because where the factual allegations and legal claims in the filed actions are substantially the same, centralization is likely to serve "the convenience of parties and witnesses and . . . promote the just and efficient conduct" of the Related Actions. 28 U.S.C. § 1407(a); *see also In re Broiler Chicken Grower Antitrust Litig.*, 509 F. Supp. 3d 1359, 1360 (J.P.M.L. 2020) (consolidating five pending actions under § 1407).

Centralized pretrial proceedings will "eliminate the potential for duplicative discovery and pretrial motion practice, as well as inconsistent pretrial rulings and scheduling." *In re OpenAI, Inc.,*

*Copyright Infringement Litig.*, 776 F. Supp. 3d 1352, 1355 (J.P.M.L. 2025). The Related Actions share common factual and legal questions and have overlapping pretrial issues, including the legal sufficiency of the claims and allegations, the factual sufficiency of evidence gathered during discovery, the appropriateness of certifying a class, and the admissibility of expert testimony. *See In re Multiplan*, 743 F. Supp. at 1377 (finding that centralization would "prevent inconsistent pretrial rulings, in particular as to class certification"); *In re Baby Food Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*, 730 F. Supp. 3d 1371, 1373 (J.P.M.L. 2024) (holding that centralization will eliminate the potential for inconsistent pretrial rulings, "particularly with respect to expert admissibility and other dispositive issues").

### B. The Panel Should Centralize the Related Actions In the Northern District of Illinois, Rather Than In the Southern District of Indiana

The Panel considers a variety of factors when determining the appropriate transferee district, including: whether the district "offers a forum that is both convenient and accessible for the parties and witnesses"; the location of "relevant witnesses and evidence"; the stated preferences of the parties; and the experience of the transferee judge and district in navigating "the nuances of complex and multidistrict litigation." *See In re Aggrenox Antitrust Litig.*, 11 F. Supp. 3d 1342, 1343 (J.P.M.L. 2014). While the papers submitted in support of transfer to the Southern District of Indiana based on these factors, as more than amply detailed below, the evidence demonstrates that each factor strongly favors transferring the case to the Northern District of Illinois.

The papers filed in support of transfer to the Southern District of Indiana also referred to other factors evaluated by the Panel. Specifically, which district has experience presiding over antitrust multidistrict litigations and which district has a closer relationship to the litigation. Once again, each such highlighted factor decisively supports transfer to the Northern District of Illinois.

### 1. The Northern District of Illinois Is Decisively More Convenient and Accessible A Forum For this Litigation than Indiana

Chicago's central position within the contiguous United States contributes to its designation as one of the most accessible cities in the United States, but there are many more facts that establish it as the most convenient and accessible forum for this litigation. To begin with, the majority of existing cases are currently pending in the Northern District of Illinois and all such cases have been consolidated before Judge Steven Seeger.

The Northern District of Illinois Courthouse is served by two major international airports—O'Hare and Midway—which offer daily nonstop flights to more than 170 destinations from O'Hare and 78 domestic destinations from Midway. Collectively, the airports handle approximately 1,300 incoming flights per day. *Id.* The high volume of inbound traffic provides for unmatched forum access, minimizing delays and supporting the convenience of the parties. In comparison, the Southern District of Indiana offers only 40 direct flights to select US cities, and the Courthouse is 20 miles away.

Transfer to the Northern District of Illinois also provides lodging capacity and convenience for litigants unmatched by Indiana or Wisconsin. Chicago boasts approximately 1,182 hotels, encompassing a wide range of accommodation options. Hotel availability near the Dirksen Federal Courthouse is particularly advantageous – there are twenty (20) hotels located within a five-minute drive, and sixteen (16) are within walking distance. *Id.* Seventeen (17) hotels are located within a ten-minute drive of O'Hare International Airport and twelve (12) within a ten-minute drive to Midway International Airport, affording travelers immediate access upon arrival. Chicago's average hotel rate of $184 per night is above the national average of $163, but this is reasonable for a major city with convenient access and amenities.

Chicago's central placement relative to all the defendants' headquarters also strongly supports transfer. At least two defendants—Rose Acre Farms, Inc. and Daybreak Foods, Inc.—maintain significant operations within Illinois itself. The other defendants are individually based in Mississippi, Indiana, Ohio, Iowa, and Wisconsin. Chicago is centrally located in the middle of defendants' respective headquarters. Chicago clearly emerges as the most appropriate venue when considering the strong and unique connection that the Northern District of Illinois has with all parties to this Conventional Egg Shell antitrust litigation.  Chicago sits as the best geographic center of these entities' locations, ensuring that no single plaintiff or defendant is disproportionately burdened by travel demands. Chicago's location, resources affordability and conveniences promote fairness and efficiency for all parties, key considerations in determining the most appropriate and convenient forum.

The arguments in favor of Indiana that emphasize operations and line employees are irrelevant. Such witnesses will not play a part in the litigation and related evidence will play a role in the instant litigation.  Additionally, although Plaintiff King Kullen references Indiana's nickname as the "Crossroads of America" (Mem. at 8), this designation stems from the intersection of major interstate highways in the region which does not benefit parties located far from Chicago who will travel by air. More specifically, air travel to Indianapolis is not nearly as convenient as air travel to Chicago for the Parties here. There is no non-stop flight between Sioux City, Iowa, where Defendant Versova is headquartered and Indianapolis, but there is a non-stop flight between Sioux City and Chicago.[2] There is no direct flight to Indianapolis Harrisburg International Airport from the closest airport to Gettysburg, Pennsylvania, where Defendant Hillandale Farms is

---

[2]    Sioux Gateway Airport, https://flysux.com/ ("Flights daily to Chicago and Denver")

headquartered, but there is a direct flight to Chicago.[3] There is no direct flight to Indianapolis

Harrisburg International Airport from Dane County Regional Airport, the closest airport to

Defendant Daybreak's headquarters in Lake Mills, Wisconsin, but there is a direct flight to

Chicago.[4] Additionally, Chicago is just a two hour by drive from Lake Mills. These case-specific

considerations decisively establish the Northern District of Illinois is the most convenient forum.

The Defendants themselves have selected Chicago for their industry events this

establishing they recognize it as convenient. Besides the DOJ investigation, related events have

taken place in the Northern District of Illinois. Urner Barry, whose egg index is at issue, hosted

major industry conferences in Chicago attended by leading egg producers, featuring discussions

on topics such as avian flu and egg pricing. This further supports the argument that the Northern

District of Illinois serves as a central and relevant connection to the evidence and a familiar

location to witnesses.

To the extent the parties are geographically dispersed the nationwide scope of this litigation

weighs in favor of transfer to the Northern District of Illinois. The Northern District of Illinois

"offers a geographically central and readily accessible forum for this nationwide litigation." *In re*

*Deere & Co. Repair Servs. Antitrust Litig.*, 607 F. Supp. 3d 1350, 1351 (J.P.M.L. 2022); *In re*

*Ameriquest Mortg. Co. Mortg. Lending Pracs. Litig.*, 408 F. Supp. 2d 1354, 1355 (J.P.M.L. 2005)

("The Panel has thus determined that the Northern District of Illinois is an appropriate transferee

---

[3]      *See* Harrisburg International Airport, *Nonstop Route Map*, https://www.flyhia.com/flight-airline-information/nonstop-route-map/
[4]      Dane County Regional Airport Madison, *Where we Fly,*
https://www.msnairport.com/flight_travel/where

district for this litigation. . . . [T]his geographically central district will be a convenient location

for a litigation already nationwide in scope.").[5]

### 2. The Northern District of Illinois is likely to contain significant evidence and witnesses relevant to the Related Actions.

The Chicago field office of the U.S. Department of Justice, Antitrust Division is currently

investigating certain of the defendants in the Related Actions for possible antitrust violations in

the egg market. *See* Yassin Qanbar, *Why Are Egg Producers Under DOJ Scrutiny? A Price Fixing*

*Crisis*, RAIN INTELLIGENCE (Mar. 28, 2025), *available at*

https://www.rainintelligence.com/blog/why-are-egg-producers-under-doj-scrutiny. The DOJ's

Chicago office is investigating whether the nation's largest egg producers (*i.e.*, the defendants in

the Related Actions) conspired to keep prices high. *Id.* The investigation involves, at least,

Defendants Cal-Maine foods, Inc. and Rose Acre Farms, Inc. *Id.*

This Panel has recognized that selecting a transferee district where a government

investigation is ongoing "may also provide efficiencies in the pretrial proceedings of the private

lawsuits." *In re: Polyurethane Foam Antitrust Litig.*, 753 F. Supp. 2d 1376, 1378 (J.P.M.L. 2010)

(transferring cases to district where "grand jury proceedings and government investigation" were

ongoing); *see also In re: Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L.

---

[5]      *See also In re Loc. TV Advert. Antitrust Litig.*, 338 F. Supp. 3d 1341, 1343 (U.S. Jud. Pan. Mult. Lit. 2018) (transfer to N.D. Ill.; N.D. Ill. "geographically central and convenient location"); *In re Delta Dental Antitrust Litig.,* 433 F. Supp. 3d 1358, 1359 (U.S. Jud. Pan. Mult. Lit. 2020) (transfer to N.D. Ill.; "Northern District of Illinois a geographically central and accessible forum for this nationwide litigation"); *In re Dealer Mgmt. Sys. Antitrust Litig.,* 291 F. Supp. 3d 1367, 1369 (U.S. Jud. Pan. Mult. Lit. 2018) (transferring to N.D. Ill.; "The district is a central, readily accessible venue for all parties."); *In re: Opana ER Antitrust Litig.,* 65 F. Supp. 3d 1408, 1409 (U.S. Jud. Pan. Mult. Lit. 2014) (transfer to N.D. Ill.; "provides a geographically central forum for this nationwide litigation that will be convenient and accessible for the parties and witnesses"); *In re: Text Messaging Antitrust Litig.*, 588 F. Supp. 2d 1372, 1373 (U.S. Jud. Pan. Mult. Lit. 2008) (transfer to N.D. Ill.; "provides a relatively central forum for this nationwide litigation").

2008) (transferring action to district where, among other things, "the government investigation is ongoing . . . , and relevant documents and witnesses are likely to be found there"); *In re Foundry Resins Antitrust Litig.*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004) ("The presence of the government investigation and federal grand jury in the [district] also tilts toward centralization in the [district].").

Where, as here, where government investigations or cases precede multiple private class actions, the Panel routinely selects the district where the government action is pending as the transferee district. *See, e.g., In re Amino Acid Lysine Antitrust Litig.*, 910 F. Supp. 696, 698 (J.P.M.L. 1995) ("We are persuaded that the Northern District of Illinois is the appropriate transferee forum for this litigation. . . . the Northern District of Illinois is the situs of an ongoing grand jury investigation '); *In re Folding Carton Antitrust Litig.*, 415 F. Supp. 384, 386 (J.P.M.L. 1976) ("Transfer to [the Northern District of Illinois] will best facilitate the coordination that will no doubt be necessary between the private actions and the seminal Government criminal and civil actions which are pending in Illinois.").[6]

---

[6]    *See also In re Qualcomm Antitrust Litig.*, 273 F. Supp. 3d 1373, 1376 (J.P.M.L. 2017) (transfer to district where FTC civil enforcement action was pending); *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 222 F. Supp. 3d 1341, 1344 (U.S. Jud. Pan. Mult. Lit. 2017) (centralization where DOJ investigation pending); *In re Liquid Aluminum Sulfate Antitrust Litig.*, 159 F. Supp. 3d 1382, 1383 (J.P.M.L. 2016) (transfer to District where "related criminal action is pending"); *In re Toilet Seat Antitrust Litig.*, 387 F. Supp. 1342, 1344 (J.P.M.L. 1975) (transfer to district of where government civil action located); *In re Lithium Ion Batteries Antitrust Litig.*, 923 F. Supp. 2d 1370, 1371 (J.P.M.L. 2013) ("Relevant grand jury proceedings also are reportedly underway in this district."); *In re Polyurethane Foam Antitrust Litig.*, 753 F. Supp. 2d 1376, 1378 (J.P.M.L. 2010) ("The presence of the grand jury proceedings and government investigation in the Northern District of Ohio, albeit in a different division than the civil actions are pending, may also provide efficiencies in the pretrial proceedings of the private lawsuits."); *In re Optical Disk Drive Prods. Antitrust Litig.*, 701 F. Supp. 2d 1382, 1383 (J.P.M.L. 2010) ("Relevant grand jury proceedings are also underway in this district."); *In re Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L. 2008) (transfer to district where "government investigation is ongoing"); *In re Packaged Ice Antitrust Litig.*, 560 F. Supp. 2d 1359, 1361 (J.P.M.L.2008) ("Eastern District of Michigan than in any other district.

### 3. The Northern District of Illinois is well-resourced and has extensive experience with complex litigation, especially litigation involving food and agricultural products.

Additional factors clearly establish the Northern District of Illinois as the ideal venue to centralize the Conventional Shell Egg Antitrust Litigation. Civil litigation in the Northern District of Illinois has a median time from filing to disposition of 7.1 months—substantially shorter than the Southern District of Indiana's 12.2 months. [7]

Generally, the Northern District of Illinois is highly experienced as an MDL transferee and has several active judges available who are not currently assigned to an MDL case. Specifically, Judge Seeger has previously presided over an antitrust jury trial involving these same defendants, acquiring significant experience with the issues and evidence that will be central to the MDL pretrial proceedings.

Moreover, the Northern District of Illinois has previously presided over many MDLs and other complex matters involving food and agricultural products. *See, e.g.*, *In re Turkey Antitrust Litigation*, No. 19-cv-08318 (N.D. Ill.); *Jien, et al. v. Perdue Farms, Inc., et al.*, No. 19-cv-00252, MDL No. 3030 (N.D. Ill.); *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.); *In Re: 100% Grated Parmesan Cheese Marketing and Sales Practices Litigation*, No. 16-cv-05802, MDL No. 2705 (N.D. Ill.); *In re Dairy Farmers of America, Inc. Cheese Antitrust*

---

Additionally, the grand jury investigating the packaged ice industry is based in this district."); *In re Marine Hose Antitrust Litig. (No. II)*, 531 F. Supp. 2d 1381, 1382 (U.S. Jud. Pan. Mult. Lit. 2008) ("Southern District of Florida is an appropriate transferee district for pretrial proceedings . . . where a grand jury investigation into the marine hose industry is underway.); *In re Foundry Resins Antitrust Litig.*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004) (The presence of the government investigation and federal grand jury in the Southern District of Ohio also tilts toward centralization in the Southern District of Ohio.").

[7]    U.S. District Courts-Civil Judicial Business (Table C-5), USCourts.gov (June 30, 2025), https://www.uscourts.gov/data-news/data-tables/2025/06/30/statistical-tables-federal-judiciary/c-5.

*Litigation*, No. 09-cv-03690, MDL No. 2031 (N.D. Ill.). This experience makes the Northern District of Illinois an ideal transfer forum.

This specific experience and faster case resolution support transferring to the Northern District of Illinois for effective consolidation. *See* Manual for Complex Litigation § 20.131 (4th ed. 2004) ("The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts.").

> **4. Judge Seeger has experience with related litigation that supports transfer to the Northern District of Illinois, as do many other judges in the district.**

Transfer to the Northern District of Illinois and assignment of the Conventional Shell Egg Antitrust Litigation to Judge Steven C. Seeger best satisfies the goals of the JPMDL and the needs of the parties. Direct, practical experience and specialized knowledge serve as an invaluable foundation for effective litigation. Per Northern District of Illinois directive, all Conventional Shell Egg cases pending or filed in the Northern District of Illinois are referred to Judge Seeger because will promote judicial efficiency and facilitate a timely resolution of this case. This approach aligns with previous Panel rulings, which have found that transferring litigation to the district where the presiding judge has subject matter expertise, or familiarity with related cases, serves the efficiency objectives underlying 28 U.S.C. § 1407. *See In re W. States Wholesale Natural Gas Antitrust Litig.*, 290 F. Supp. 2d 1376, 1378 (J.P.M.L. 2003) (assigning MDL to a judge familiar with the issues presented "as a result of his previous experience in presiding over" a related MDL); *In re Shell Oil Prods. Co. Dealer Franchise Litig.*, 206 F. Supp. 2d 1373, 1374 (J.P.M.L. 2002) (assigning MDL to a judge familiar with the allegations at issue "as a result of presiding over a related predecessor

action"). Transferring the Related Actions to the Northern District of Illinois would allow for them to be assigned to Judge Seeger, a judge who is not currently presiding over any MDL.[8]

Judge Seeger brings relevant subject-matter because he presided over the trial in *Kraft Foods Global, Inc. v. United Egg Producers, Inc.*, No. 1:11-cv-08808, which addressed industry and defendant related issues closely aligned with those presented here. In 2023, Judge Seeger presided over a five-week liability trial and a separate damages trial against Cal-Maine Foods, Inc. and Rose Acre Farms, Inc. *See Kraft Foods Global Inc., et al., v. United Egg Producers Inc., et al.*, No. 11-cv-8808 (N.D. Ill.). His hands on experience with the core factual and legal issues of the Related Actions is unparalleled, and no other judge or forum under consideration can equal or replicate the efficiencies gained from his preexisting knowledge of the parties, the markets, and the alleged conduct.

Judge Seeger's docket and experience otherwise make him particularly qualified to serve as the transferee judge for this matter. Judge Seeger has 20 standing orders including for amending complaints, depositions, discovery, experts, motions and memoranda of law, and summary judgment evidencing his efficient and clearly managed courtroom and docket.[9] He currently handles 488 civil and 53 criminal cases, which is below the Northern District of Illinois average of about 550 civil cases per judge. This lighter caseload and his interest in the litigation evidence Judge Seeger has the capacity to oversee the requirements of a multidistrict proceeding effectively.

Northern District of Illinois Magistrate Judge Beth Jantz, who would likely assist with pretrial issues, similarly has a low docket, with 147 open civil cases and 70 open criminal cases.

---

[8]    MDL Statistics Report – Distribution of Pending MDL Dockets by District, J.P.M.L. (Nov. 3, 2025), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-November-3-2025.pdf.

[9]    See https://www.ilnd.uscourts.gov/judge_display.php?LastName=Seeger#procedures.

Neither Judge Seeger nor Judge Jantz is currently overseeing any active multidistrict litigations, ensuring that the Court can devote ample attention to this litigation.

Consolidation and assignment to Judge Steven C. Seeger. will best advance the objectives and purposes of the JPMDL because it will provide the ideal opportunity for a capable and experienced judge to gain MDL experience. It will expand the roster of judges available to the Panel for future assignments should the need arise.

The DOJ's Antitrust Division Chicago Field Office is investigating alleged anticompetitive practices by egg producers. Assigning this case to Judge Steven C. Seeger in the Northern District of Illinois enhances coordination with the federal investigation, prevents redundant efforts, and streamlines case management. Judge Seeger's familiarity with related cases, his manageable docket, and the district's limited MDL load further support this transfer, ensuring efficient and consistent handling of all related actions. These circumstances strongly support transfer to the Northern District of Illinois.

### 5. The Majority of Existing Cases Are Currently Pending in the Northern District of Illinois

Presently there are eight related actions[10]. Five of those, including Plaintiff Yell-O-Glow, are filed in the Northern District of Illinois, making it the clear focal point of the litigation. Those cases involve overlapping defendants, arise from the same alleged course of conduct, and present substantially identical factual and legal issues. As a result, the Northern District of Illinois is already where the core disputes are being litigated, where the parties have begun briefing common issues, and where judicial resources have been invested in understanding the claims. Centralizing

---

[10]    See Exhibit 2 – List of Related cases.

all related actions here would therefore capitalize on that existing investment, rather than requiring another court to duplicate the same foundational work.

Consolidation in the Northern District of Illinois would also materially reduce inefficiency and the risk of inconsistent rulings. If related cases remain scattered across multiple jurisdictions, courts will be asked to interpret the same pleadings, resolve the same threshold motions, and manage overlapping discovery in parallel—an outcome that the related-case doctrine and MDL framework are designed to avoid. By contrast, keeping all cases in a single forum ensures uniform resolution of dispositive issues, coordinated discovery, and a streamlined pretrial process. Given that the majority of cases are already pending here, centralization in this District is not merely convenient—it is the most practical and judicially sound approach.

### 6. If the Panel does not Transfer the Related Actions to the Northern District of Illinois, the Western District of Wisconsin is the Next Most Appropriate Forum

If the Panel does not transfer the Related Actions to the Northern District of Illinois, which is clearly the most appropriate and convenient forum for centralization, Direct Purchaser Plaintiff Yell-O-Glow submits that the Western District of Wisconsin is a more appropriate forum than the Southern District of Indiana because it is centrally located in the United States, has no pending MDL's, and has a lower average time from filing to disposition (7.0 months) than the Southern District of Indiana (12.2 months).[11]

---

[11]    The action pending in the Western District of Wisconsin is not yet assigned to either of the two Article III judges in the district, who are both experienced and capable jurists with antitrust experience.[11] Chief Judge James Peterson, appointed in 2014, has led as Chief Judge since 2017 and overseen antitrust cases such as *Loop LLC v. CDK Glob., LLC* (No. 24-CV-571) and *Team Schierl Companies v. Aspirus, Inc.* (No. 22-CV-580). Judge William Conley, appointed in 2009 and Chief Judge from 2010–2017, presided over cases like *Fourqurean v. NCAA* (25-cv-

### III.    CONCLUSION

For the foregoing reasons, and pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Direct Purchaser Plaintiff Yell-O-Glow Corporation supports consolidation and transfer of these actions to the Northern District of Illinois. Centralization in that District will promote efficient and coordinated pretrial proceedings, conserve judicial and party resources, and align with the ongoing criminal investigations in the District arising from the same core facts and involving overlapping parties. Assignment to Judge Steven C. Seeger is particularly appropriate given his familiarity with the industry, claims, and defendants, his current supervision of the related actions pending in this District, his expressed willingness to preside over the litigation, and his capacity to devote focused attention to this matter.

Chicago's extensive flight and hotel availability, affordability and centrality to all defendants' operations make it the most logical and equitable venue for transfer. The city provides a level of accessibility and logistical support that the other proposed districts simply cannot match.

For the reasons stated above, Illinois Direct Purchaser Plaintiff Yell-O-Glow respectfully request that the Panel grant transfer and centralization pursuant to 28 U.S.C. § 1407 and that the Panel transfer the Related Actions, as well as any future tag-along actions, to the Northern District of Illinois for consolidated or coordinated pretrial proceedings before Judge Seeger.

---

68) and *Ashley Furniture Industries, Inc. v. Packaging Corp. of America* (16-cv-469). Both judges possess significant experience to handle the Related Actions.

Dated: December 31, 2025

/s/ Robert J Bonsignore
Robert J. Bonsignore*
**Bonsignore Trial Lawyers, PLLC**
193 Plummerhill Road
Belmont, NH 03220
Phone: (781) 350-0000
Cell Phone: (781) 354-1800
Fax: (702) 852-5726

*Attorney for Plaintiff Yell-O-Glow and the Proposed
Class of Direct Purchasers*